**Albert UDIN, Plaintiff,**

v.

**J. KAUFMAN IRON WORKS, INC.,**
**Defendant.**

**No. 66 Civ. 2378.**

United States District Court,
S. D. New York.

April 10, 1972.

Seidman & Fisher, New York City, for plaintiff; by Julius Fisher, of counsel.

Robert W. Fiddler, New York City, for defendant.

## OPINION

NEWMAN, Judge, Customs Court, *sitting by designation.*

This is an action for patent infringement (35 U.S.C. § 281) tried by the court without a jury. Jurisdiction and venue are predicated upon 28 U.S.C. §§ 1338(a) and 1400(b).

The patent relates to an "ADJUSTABLE WINDOW GRILLE WITH COLLAPSIBLE BOTTOM GUARD BARS". The grille in question is of the extensible lazy tongs type, and is designed to prevent entry through windows or other openings by burglars.

Plaintiff (a resident of New York) is the individual patentee and his New York corporation, Albert Udin, Inc., manufactures adjustable window grilles and folding gates. Defendant (a New York corporation) manufactures and sells an extensive window grille which is accused of possessing features covered by plaintiff's patent.

Plaintiff seeks: *injunctive relief* against further infringement by defend-ant (35 U.S.C. § 283), an accounting for profits and damages (35 U.S.C. § 284), and costs.

Defendant by answer and a counterclaim contests the validity of the patent and denies any infringement even if the patent were valid. Another counterclaim is asserted for alleged patent misuse and antitrust violations arising out of plaintiff's attempt to monopolize subject matter in the public domain. (15 U.S.C. §§ 2, 15 and 26.)

Defendant seeks: dismissal of the complaint; a declaratory judgment of invalidity and noninfringement (28 U.S.C. §§ 2201 and 2202); injunctive relief from charges of infringement by plaintiff or his employees; treble damages under § 4 of the Clayton Act; attorney's fees and costs.

The counterclaims are denied by plaintiff, and he asks their dismissal.

### The Background of the Patent

Plaintiff has been in the business of designing and manufacturing iron protective gates since 1924. He employs his son-in-law, Murray Blecher, as a salesman and Blecher sells plaintiff's window grilles to retail hardware stores. Mr. Udin knew, from receiving many complaints from the hardware stores over a period of several years, there was a long-standing problem of burglars breaking through his window grilles by bending or breaking them at the lower pivotally-connected ends. Consequently, early in 1964 plaintiff decided to incorporate into his window grilles a protective feature which would prevent the lower pivotally-connected ends of the grillework from being "jimmied".

Plaintiff sought to solve the problem of burglars breaking through his gates by providing duplicate pairs of spaced guard bars on each side of the grille which would: (1) form an enclosure restricting access to the lower pivotally-connected ends of the extensible unit channel links; and (2) protect the lower pivotally-connected ends of the grille from being bent, broken or displaced out

of their normal plane to either side of the gate (perpendicular to the plane of the gate) by one attempting to gain entry. As stated in the disclosures of plaintiff's patent:

The primary object of the present invention is to economically produce a grille of this kind which is adjustable while having qualities present in a fixed grille, such as vertical bars mounted in conjunction with the grille structure.

A further object is to provide a grille of this kind with means to prevent tampering with the movable grille members at the bottom thereof.

Although the record does not precisely indicate when plaintiff first conceived the idea of using protective guard bars on his window grilles, it appears that in May or June of 1964 he made a prototype or model of his improved gate. To plaintiff's knowledge there was no similar window grille on the market at that time.

Mr. Udin's application for a patent was filed in the Patent Office on August 5, 1964. Plaintiff testified that he initially sold his improved window grille with protective guard bars in August or September 1964 "or something like that" (Tr. 22); and that on October 28, 1964 he first became aware that defendant was selling the "Diamond Guard" folding gate possessing protective links similar to plaintiff's guard bars.

Defendant's vice-president, David M. Kaufman, testified that his "Diamond Guard" folding gate with an "Invincible brace" was first sold on or about October 9, 1964 (Tr. 328, 333, 357, 359, 398, 399). A photostatic copy of a "price list and discount schedule" dated October 15,

1964 (Deft.'s Exh. A, p. 23) depicting the "Diamond Guard" folding gate states: "[T]he INVINCIBLE jacknife [sic] webbing brace is now being introduced because of the rising demands for a folding gate that will withstand more than normal abuse. We have taken a standard DIAMOND-GUARD * folding gate and added a jacknife [sic] webbing brace to make the diamonds rigid, thereby preventing intruders from manually bending the bottom or top points of the webbing". Kaufman further testified that defendant manufactured gates other than those called "Invincible", which had "bottom guard bars" (Tr. 361; Tr. of Dep. 9–13, 16).

Plaintiff's attorney caused the patent application to be expedited (taken out of turn) by means of a petition to the Commissioner of Patents requesting an accelerated examination upon the ground that defendant's "Diamond Guard" folding gate with an "Invincible brace" infringed the claims in plaintiff's application. After a thorough review of the merits, the application was rejected by the examiner pursuant to 35 U.S.C. § 103 on the ground that the features of the claimed invention were obvious in light of the prior art. However, on appeal the Patent Board of Appeals reversed the decision of the examiner for the reasons discussed *infra,* and patent No. 3,258,061 was issued on June 28, 1966.

The complaint herein was filed on August 2, 1966 and was predicated on patent No. 3,258,061, containing a single claim. Subsequent to the filing of the complaint plaintiff surrendered his original patent No. 3,258,061, and pursuant to 35 U.S.C. § 251[1] he obtained reissue

1. Section 251 provides: "Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with

a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue".

In his application for a reissue patent, Udin states: " * * * that he verily believes the original patent to be wholly or partly inoperative or invalid by reason of the patentee claiming less than he had a right to claim in the patent by virtue of error on the part of his previous attorneys in placing unnecessary limitations

patent No. 26,259 on August 29, 1967. Udin's reissue patent contains two claims: the single claim of the surrendered original patent (claim 1 in the reissue patent), and an additional claim (claim 2 in the reissue patent). The disclosure in claim 1 of the reissue patent is identical to the single claim of the original patent. Claim 2 omits certain limitations that are present in claim 1.

By an amendment to the complaint on February 5, 1968, plaintiff charged defendant with infringing both claims of the reissue patent as well as the single claim of the original patent. However, plaintiff now concedes that in accordance with 35 U.S.C. § 252 defendant has intervening rights respecting the second claim (claim 2) of the reissue patent. The parties have agreed and the court has ordered that for the *purpose of determining the issue of infringement*, claim 2 would be eliminated from plaintiff's case (Tr. 7) However, defendant has placed squarely in issue the *validity of claims 1 and 2 of the reissue patent* by its counterclaim for a declaratory judgment of invalidity. Hence, both claims 1 and 2 must be deemed to be involved in this case under that counterclaim.[2]

### Plaintiff's Window Grille

For a better understanding of the construction of plaintiff's window grille and the structural relationship of the guard bars to the other elements of the grille, reference is made to the drawings in Figures 1 through 6 of the Appendix which form a part of plaintiff's disclosure.

The window grille structure comprises a framework including side frame members, referred to as vertical stiles 12 and 14, and bottom end pivotal frame members in the form of pairs of straight flat metal bars or links 16, 16 and 18, 18, referred to herein as "guard bars". The guard bars are pivotally-connected at one end to the stiles 12 and 14 by means of pivot pins 20; and the other ends of the guard bars are overlapped, with the overlapped ends pivotally-connected by a pivot pin 22. Pivot pin 22 is disposed above the plane of pivot pins 20.

Each vertical stile 12 and 14 comprises a pair of channel irons 24. The channel irons 24 are held together by rivets 26 and are maintained in spaced relation by spacer sleeves 28 through which the rivets extend.

A central stile 30 comprised of a pair of opposed channel irons 32 is provided which extends vertically through the center of the framework. The overlapped ends of the guard bars are disposed within a trackway 40 on the central stile 30 for guiding their sliding movement.

A linkage is formed from the angularly disposed links 44. These links consist of channel-shaped bars. Links 44 crisscross each other and are pivotally-connected together by rivets 46 at spaced intervals. The linkage is connected to the side stiles 12 and 14 and extends through the central stile 30. The adjacent top and bottom ends of links 44 are pivotally-connected together by rivets 48 and 50, respectively, so that a straight-line linkage results.

The guard bars at the bottom of the grille are duplicated at the front and rear of the lazy tongs framework, providing a space within which the overlapping and pivotally-connected lower ends of the grille are positioned and protected when the grille is extended (Fig. 1). Additionally, it is noted that the guard bars are connected directly to the side stiles 12 and 14 by the same connecting pins 20 that hold the channel irons of the side stiles 24 together with spacer sleeves. The guard bars pivot simultaneously and automatically with the opening and closing of the grille. When the grille is

---

in the allowed claim caused the patent to be at least partially inoperative to define the scope of patentee's invention * * * ".

2. For convenient reference, claims 1 and 2 of plaintiff's reissue patent are set forth in the Appendix.

opened to a fully extended position (Fig. 1) from a closed position (Fig. 2), the guard bars pivot at both ends, "ride" down the trackway 40, and extend over the bottom of the gate. When the gate is returned to the closed position, the guard bars pivot at both ends, "ride" up the trackway 40, and form an inverted "V" (Fig. 2).

### The Accused Gate

Defendant's accused gate (Figs. 7, 8 and 9) is structurally and operationally similar to plaintiff's grille, with the principal differences being the following: In defendant's gate the inner ends of the "guard bars" are not directly interconnected together in overlapping relationship, but they are each pivotally interconnected to an intermediate connecting link, said link being disposed for sliding movement within a trackway on the center stile. The link connecting the two free ends of the guard bars in defendant's gate has an indentation or "U" shape in the center of the link so that it can pass through the trackway and prevent the center stile from being pushed askew. Additionally, each "guard bar" on the accused gate covers only one lower pivotally-connected end of the grille, while in plaintiff's gate all of the lower pivotally-connected ends are covered by the guard bars.

### Obviousness

Patentability is dependent upon three statutory tests: novelty, utility and nonobviousness.[3] Defendant insists that plaintiff's invention is obvious in light of the prior art and therefore is unpatentable, as initially determined by the Patent Office examiner. Plaintiff, on the other hand, strenuously argues that his invention is nonobvious and accordingly the patent is valid. The "pivotal issue", then, is whether "the differences between the subject matter [of plaintiff's patent] * * * and the prior art are

such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art * * *". 35 U.S.C. § 103.

In the landmark holding of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court held that the issue of obviousness under section 103 is a matter of law to be determined upon the basis of several factual inquiries (383 U.S. at 17–18, 86 S.Ct. at 694):

> * * * [1] the scope and content of the prior art are to be determined; [2] differences between the prior art and the claims at issue are to be ascertained; and [3] the level or ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. * * *

Moreover, in *Graham* the following pertinent excerpts from the Congressional reports on section 103 were cited[4] (383 U.S. at 14–15, 86 S.Ct. at 692):

> Section 103, for the first time in our statute, provides a condition which exists in the law and has existed for more than 100 years, but only by reason of decisions of the courts. An invention which has been made, and which is new in the sense that the same thing has not been made before, *may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent.* That has been expessed in a large variety of ways in decisions of the courts and in writings. Section

---

3.  35 U.S.C. §§ 101, 102 and 103.

4.  The Senate and House Reports, S.Rep. No.1979, 82d Cong., 2d Sess. (1952);

H.R.Rep.No.1923, 82d Cong., 2d Sess. (1952).

103 states this requirement in the title. It refers to the difference between the subject matter sought to be patented and the prior art, meaning what was known before as described in section 102. If this difference is such that the subject matter as a whole would have been obvious at the time to a person skilled in the art, then the subject matter cannot be patented. [Emphasis added.]

That provision paraphrases language which has often been used in decisions of the courts, and the section is added to the statute for uniformity and definiteness. This section should have a stabilizing effect and minimize great departures which have appeared in some cases. * * *

*The Prior Art*

Pursuing the inquiries mandated in *Graham* by the Supreme Court, the scope and content of the prior art will be determined initially.

Here, the prior art references considered by the Patent Office were: Bataille, U.S. Patent No. 949,739 (February 15, 1910); Pitt, U. S. Patent No. 352,660 (November 16, 1886); and Pitt, U. S. Patent No. 312,380 (February 17, 1885). Additionally, defendant relies upon blueprint plans of folding gates with a jackknife brace (Deft.'s Exh. E).

*Bataille patent.* This patent relates to a folding gate of the lazy tongs type for use in closing off the entrance to or exit from a passenger elevator or railroad car. Illustrations of the Bataille gate are reproduced in the Appendix at Figs. 10 and 11. As may be noted from the illustrations, Bataille's gate comprises a frame-work having upright side stiles

(a, b) an upright center stile (c) and flat bottom bars (e, f). The flat bottom bars are pivotally-connected at one end to plates (e′, f′), which are attached to the bottom of the side stiles; and the inner ends of the bars are overlapped and pivotally-connected to each other. A plurality of interwoven manually movable lazy tongs grille links (d, d′) angularly disposed in relation to each other are interposed between the side stiles and extend through the center stile. The center stile has a trackway (c′) for guiding the movement of the overlapped ends of the flat bottom bars.

Although Bataille's protective bars had a different purpose [5] than Udin's "guard bars", Bataille's claims disclose:

1. "The combination with the upright and intermediate members of a folding gate, of bars pivoted at their ends to the end upright members of the said gate and in use occupying a horizontal position and means by which said bars are raised into an upright position as the members of the gate are brought together in a compact relation". (Claim 1.)

2. The free ends of the bars overlap and have a pivotal connection. (Claims 2 and 3.)

3. The intermediate stile of the gate has a guide for the overlapped ends of the bars. (Claim 3.)

*Pitt patent (No. 352,660).* This patent apparently was cited by the examiner only for the purpose of establishing that the use of stiles and links of channel shape in lazy tongs gates was old in the art. However, plaintiff does not claim as his invention the shape of the stiles and links.

*Pitt patent (No. 312,380).* While not specifically relied upon in his rejection

---

5. Bataille's disclosures note that passengers standing alongside a folding gate would place their feet under the gate or would take hold of the bars with their hands, thereby risking personal injury from the closing of the gate. To prevent such accidents Bataille employed protective bars pivoted to the gate having a horizontal position at the bottom or top edges, or both, and movable automatically with the

closing or opening movements of the gate members. The employment of the bars at the bottom or lower edge of the gate on the inside prevents a passenger standing alongside the gate from getting his or her feet beneath the gate, and such bars when employed at the top and grasped by the hand remind one by their movement to withdraw the hands and thus avoid the risk of injury.

of Udin's application, the examiner called this patent to the attention of the Patent Board of Appeals. The patent discloses the use of a locking bar arrangement straddling the vertical pickets or upright bars at the top of an extensible gate, whereby the gate cannot be forced laterally. Each locking bar is hinged at its outer end to upright stiles. The locking bars move independently of the gate, and come into use only after the gate has been expanded or placed in its operative position. As a final step, the locking bars are manually brought down over the upper ends of the pickets, so that the gate cannot move in any direction.

*Bostwick type folding gate.* This blueprint exhibit [6] of a Bostwick type folding gate is relied on by defendant to prove that the use of jackknife braces on lazy tongs folding gates is old in the art. In the Bostwick gate illustrated in the blueprint, a jackknife brace is located approximately in the middle of the gate in relation to its vertical height of eight feet, and must be moved independently of the rest of the gate, viz., the brace must be pushed before the gate is moved. The purpose of the jackknife brace is to stiffen the gate when it is in an open position, and give it rigidity so that if pushed, the gate will not bow out of its normal vertical plane.

### Differences Between the Prior Art and the Claims at Issue

Plaintiff does not claim inventorship of the lazy tongs gate *per se*, which is conceded to be old in the art. Rather, Mr. Udin asserts that he has improved such gate by adding duplicate pairs of collapsible protective guard bars (or links) on each side of the gates between which are received the lower pivotally-connected ends of the channel-shaped links which form the grillework of the extensible unit.

As heretofore noted, in the Bataille gate protective bars e and f (which are analogous to the guard bars in plaintiff's grille) are attached to the plates e' and f' rather than directly to the side stiles as in plaintiff's grille. Moreover, in the Bataille gate there is only a single pair of bars on the front side of the gate, whereas on plaintiff's grille there are duplicate pairs of guard bars on both the front and the rear sides of the grille.

Thus, the features of plaintiff's grille which are claimed to make it patentable over prior art revolve about the duplication of the guard bars on the front and rear sides of the grille, and the manner in which the bars are incorporated in and connected to the grille. Therefore, it is necessary to determine whether it would have been obvious to someone having ordinary skill in the art to duplicate the guard bars on both sides of plaintiff's grille and to pivot the guard bars on the side stiles at connecting pin 20 (Fig. 1).

Testifying for defendant, Mr. Kaufman, a mechanical engineer with eleven years of experience in the iron works business, and a holder of patents on folding gates, and Julius B. Foster, an engineer and patent lawyer for some fifty years, stated that it would be obvious to duplicate the guard bars on the rear side of plaintiff's gate if they were needed there (Tr. 345, 397–98). Foster opined: "Anyone working in that field [folding gates] would do that without question" (Tr. 398).

Plaintiff's witness Ferdinand R. Singer, professor of mechanical engineering at New York University, reluctantly testified on cross-examination that if they were needed there "it might be obvious to duplicate the guard bars on the rear side of the [Bataille] gate" (Tr. 187–88).

I have concluded that duplication of the guard bars on both sides of plaintiff's window grille would have been obvious to anyone having ordinary skill in the art.

The Board of Appeals of the Patent Office reversed the examiner's rejection of Mr. Udin's application principally on

---

6. Defendant's Exhibit E.

the ground that the prior art references did not disclose nor suggest connecting the guard bars to the side stiles by the same pivot pins extending through the side stiles in spacer sleeves. The Board commented that such structural relationship of the guard bars and side stiles "would have an inherent advantage of simplification while providing strength and rigidity at the zones of the grille involved".[7] In the opinion of the Board, there was no teaching by the prior art that would have made it obvious to attach the guard bars directly to the side stiles.

Plaintiff's expert witness Philip G. Hilbert, an engineer and practicing patent lawyer for over 25 years and a former examiner in the United States Patent Office for over ten years, testified that since the bars in Bataille's gate were relatively wide as compared with the guard bars in plaintiff's grille, Bataille had to offset his bars with plates attached to the side stiles in order to properly pivot the bars. Mr. Hilbert conceded, however, that if thinner bars or links were used on a gate, it would be mere "mechanic's skill" to pivot the bars directly to the side stiles (Tr. 261–63). Moreover, he admitted on cross-examination that connecting a link on a lazy tongs gate to a side stile was old in the art (Tr. 272). Additionally, plaintiff's witness Professor Singer agreed that it would require no inventive skill to make links e and f in Bataille's gate thinner (Tr. 178–79).

Defendant's witnesses Kaufman and Foster testified that it would be obvious to anyone having ordinary skill in the art to pivot the guard bars to the bottom of the side stiles if the bars were thin enough. (Tr. 344–45, 396); [8] and that it was old in the art to use a single pin both as a pivot point and as a connecting pin (Tr. 345, 397).[9]

I find that, using thinner links than those employed in Bataille's gate for "guard bars" and pivoting them directly to the side stiles of plaintiff's grille on pivot pins 20, would have been obvious to anyone having ordinary skill in the art.

In sum, the Patent Board of Appeals distinguished plaintiff's invention from the prior art upon the basis of "exceedingly small and quite non-technical mechanical differences". Graham v. John Deere Co., supra, 383 U.S. at 36, 86 S.Ct. at 703.

■■ Plaintiff contends: "Even if the invention utilizes old elements, the claim calls for such elements to cooperate with each other in a novel combination to produce a new and useful result that is patentable". But, "novelty is not to be equated with nonobviousness". Lemelson v. Topper Corporation, et al., 450 F.2d 845 (2d Cir. 1971). Quite apart from the even stricter standard of nonobviousness applicable to so-called combination patents,[10] I have concluded that the differences between plaintiff's

7. Defendant's Exh. A, p. 61.

8. It is noted that claim 1 of Bataille's patent reads: "The combination with the upright and intermediate members of a folding gate, of bars pivoted at their ends *to the end upright members of said gate.* * * * *". [Emphasis added.]

9. The Pitt patent (No. 352,660) shows that a single pin may be used both as a connector between channel elements and as a pivot point. (Tr. 396–97).

10. Any invention depending upon a combination of old and well known elements must pass a rather severe test. Toro Manufacturing Corp. v. Jacobson Manufacturing Co., 357 F.2d 901, 904 (7th

Cir. 1966). Combination patent claims are to be scrutinized with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corp., 340 U.S. 147, 152–153, 71 S.Ct. 127, 95 L.Ed. 162 (1950). See also Anderson's Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Lorenz v. F. W. Woolworth Co., 305 F.2d 102 (2d Cir. 1962); Continental Can Co. v. Old Dominion Box Co., 393 F.2d 321, 326 (2d Cir. 1968); Lemelson v. Topper Corporation, et al., 450 F.2d 845 (2d Cir. 1971).

grille and Bataille's gate are not sufficiently great to warrant a patent.

Plaintiff urges that there is no teaching in the Bataille patent inasmuch as the problem Bataille sought to solve was different from the problem which he sought to remedy. Thus, plaintiff emphasizes that rather than protecting the feet of a person standing near a folding gate, the guard bars in his grille are designed to protect the bottom of the grille.

■ True it is that Bataille's patent was not addressed to the problem of burglars tampering with the lower pivotally-connected ends of the grillework. Nevertheless, Bataille's patent clearly suggests the use of protective jackknife bars or links which pivot automatically as the gate is opened or closed and which cover the lower pivotally-connected ends of the grillework when the gate is extended. Professor Singer admitted that the prior art Bataille gate and Udin's grille are "kinomatically equivalent"; [11] and Mr. Hilbert conceded that the function of the bars on both gates is "inherently the same".[12] Under these circumstances, the fact that Bataille's patent discloses the combination of protective bars with a lazy tongs folding gate for the purpose of protecting people's feet from injury does not enable plaintiff to possess a patent on the virtually identical combination of elements because he disclosed the use of such combination for protecting the bottom of the gate itself.

■ Fundamentally, an adaptation of prior art to a new purpose or use, involving no more than ordinary mechanical skill, does not result in patentability. Thus, in Smith v. Nichols, 88 U.S. 112,

21 Wall. 112, 119, 22 L.Ed. 566 (U.S. 1875), the Supreme Court stated:

> * * * A mere carrying forward, or new or more extended application of the original thought, a change only in form, proportions or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent.

See also: Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 89, 62 S.Ct. 37, 86 L.Ed. 58 (1941); Powers-Kennedy Co. v. Concrete Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278 (1930); Mast, Foos & Company v. Stover Manufacturing Company, 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856 (1900); Ansonia Co. v. Electrical Supply Co., 144 U.S. 11, 12 S.Ct. 601, 36 L.Ed. 327 (1892).

■ In short, a person having ordinary skill in the art who wanted to protect the lower pivotally-connected ends of a lazy tongs grille would immediately see that Bataille's invention pointed the way to accomplish that result. Whether or not Udin actually availed himself of Bataille's patent in conceiving his invention is, of course, irrelevant. Graham v. John Deere Co., 383 U.S. at page 36, 86 S.Ct. 684.[13] Udin's improved window grille clearly is a modified version of Bataille's combination of protective bars and lazy tongs gate; and the attachment of the guard bars directly to the side stiles was merely the choice of mechanical alternatives. No new or unexpected result was achieved. Cf. Zoomar, Inc. v. Paillard Products, Inc., 258 F.2d 527 (2d Cir.), cert. den. 358 U.S.

---

11. Tr. 177–78.

12. Tr. 260.

13. In Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536 (2d Cir. 1966), the Court of Appeals stated: "The statute [Section 103] sets out what may be considered a specialized reasonable man test for obviousness and the host of decisions construing this Section have further filled out the characteristics of 'a person having ordinary skill in the art to which subject matter pertains.' The proof on this issue, then, should tend to show what would be obvious to a hypothetical mechanic who, among other things, *has the prior art in mind* when he endeavours to solve the problem for which the patent is obtained". [Emphasis added.]

908, 79 S.Ct. 237, 3 L.Ed.2d 230 (1958); Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

### Identical Disclosure in the Prior Art

■ In support of the validity of his patent, plaintiff relies upon Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263 (2d Cir. 1967); and Shaw v. E. B. & A. C. Whiting Co., 417 F.2d 1097 (2d Cir. 1969), cert. den. 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811, reh. den. 398 U.S. 954, 90 S.Ct. 1866, 26 L.Ed.2d 298 (1970). Predicated upon these decisions, plaintiff contends that his patent is valid because his invention was not "identically disclosed" in the prior art. I have carefully examined the above cited cases, and find plaintiff's contention to be entirely without merit. In *Ling* and in *Shaw*, the Court of Appeals used the term "identically disclosed" with reference to "the fairly liberal test of section 101 and section 102 (a)" [14] and not with reference to the "rather rigorous standard of nonobviousness mandated by section 103".[15] Moreover, section 103 on its face makes it clear that if an invention is obvious in light of prior art, "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 * * * ".

### Statutory Presumption of Validity

■■ Plaintiff places great weight upon the statutory presumption of validity attaching to a patent (35 U.S.C. § 282),[16] and the rule that such presumption is reinforced as against prior art references considered by the Patent Office when it granted a patent application. Skil Corporation v. Cutler-Hammer, Inc., 412 F.2d 821 (7th Cir. 1969). In point of fact, the prior art patent references

cited herein were considered by the Patent Office.

However, in *Graham*, the Supreme Court "observed a notorious difference between the standards [of patentability] applied by the Patent Office and by the courts". 383 U.S. at pages 18–19. This difference in standards of patentability is dramatically illustrated by the following comment by Mr. Justice Douglas in his concurring opinion in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., *supra*, 340 U.S. at pages 156–58, 71 S.Ct. at pages 132–133:

> The attempts through the years to get a broader, looser conception of patents than the Constitution contemplates have been persistent. The Patent Office, like most administrative agencies, has looked with favor on the opportunity which the exercise of discretion affords to expand its own jurisdiction. And so it has placed a host of gadgets under the armour of patents—gadgets that obviously have had no place in the constitutional scheme of advancing scientific knowledge. A few that have reached this Court show the pressure to extend monopoly to the simplest of devices: * * [case citations omitted].
>
> The patent involved in the present case belongs to this list of incredible patents which the Patent Office has spawned. The fact that a patent as flimsy and as spurious as this one has to be brought all the way to this Court to be declared invalid dramatically illustrates how far our patent system frequently departs from the constitutional standards which are supposed to govern.[17]

In the recent Lemelson v. Topper case, the Court of Appeals commented that "the volume of patent applications processed by the Patent Office, and the *ex*

---

14. 417 F.2d at 1101.

15. Lemelson v. Topper Corporation, et al., 450 F.2d at 848.

16. The statutory presumption of validity also applies to a reissue patent. England

v. Deere & Company, 284 F.2d 460 (7th Cir.), cert. denied 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860 (1961).

17. This paragraph is in no wise to be construed as critical of plaintiff's efforts.

*parte* nature of their proceedings undermine the weight of the statutory presumption". 450 F.2d at 849. And in Richmond Screw Anchor v. Superior Concrete Accessories, 256 F.2d 232 (2d Cir. 1958), the Court of Appeals significantly stated:

> It must be understood that the prior art, even if embodied in the file wrapper and presumably considered by the examiner in the Patent Office, involved only an *ex parte* presentation, whereas at the trial the examination of witnesses on the important prior art patents * * * disclosed that the alleged invention of the patentee was "obvious" to the skilled mechanic.

Further, in Lorenz v. F. W. Woolworth Co., 305 F.2d 102, 105 (2d Cir. 1962), the Court of Appeals observed that "the most that can be said of the presumption is that it requires that reasonable doubt on the question of validity be resolved in favor of the patent holder". I do not find reasonable doubt on the question of validity. Accordingly, the presumption of validity has been rebutted.

### Secondary Considerations

In support of the contention that his invention is nonobvious, plaintiff relies upon certain "subtests of nonobviousness" (commercial success and long-felt but unsolved needs), which Justice Clark indicated in *Graham* might be utilized by the judiciary to "guard against slipping into use of hindsight", and "to resist the temptation to read into the prior art the teachings of the invention in issue". 383 U.S. at 36, 86 S.Ct. at 703.

In Ling-Temco-Vought, Inc., *supra,* 372 F.2d at 269, the Court of Appeals commented that "where the invention is minor and nontechnical such [secondary] considerations are of little value" in resolving the issue of obviousness. The invention in question here is seemingly "minor and non-technical". However, inasmuch as plaintiff heavily relies upon secondary considerations to buttress his contention that his invention is nonobvious, a brief discussion is warranted.

*Long-felt but unsolved needs.* Plaintiff's evidence fails to show the date upon which he commenced working on his invention, but apparently it was sometime in the Spring of 1964. By May or June of 1964, Udin already had produced a model or prototype of his improved window grille, and there is no indication that he encountered or experienced any difficulties or failures in conceiving his invention or making his model. Mr. Udin appeared to be an honest, earnest gentleman; and undoubtedly, he is a good craftsman in his trade, despite his lack of academic education.

While the problem of burglars bending up the bottom of lazy tongs window grilles may have been felt in the industry long before 1964, nonobviousness need not necessarily be the explanation for the fact that protective guard bars were not added to window grilles by the parties until 1964. It is entirely possible that the added cost or expense involved was not thought to be warranted until there was a sufficient increase in demand for a more protective (and more expensive) [17] window grille.

In this connection, Mr. Kaufman testified (Tr. 401–2):

> THE COURT: How long did this rising demand [for window grilles with guard bars] run? How much before your manufacture of this type of gate?
>
> THE WITNESS: Well, our problem of demand is two-fold because we are in a very competitive market, not between competitors but between the amount of available money from the customers that are buying this product. Most of these gates go into the real indigent areas where the crime rate is the highest. So, although we

---

17. In 1964 plaintiff sold his gates for $8.00 prior to the time the guard bars were added; and thereafter the gates were sold for $10.00 (Tr. 86). The addition of the guard bars thus increased the price of the gates to retail stores by 25%.

always had complaints prior to it, when we told them we could give them something else or add a bar, that we could make a simple drop bar or custom jackknife brace to fit their gate, the cost was a little bit excessive. But, throughout the early part of June and that summer in '64, we just got enough complaints that we decided to tell them, if you want us to do something, we've got something else that we can add on. Several people bought it, and it worked.

*Commercial success.* Plaintiff's proof of commercial success is meager at best. No sales records or other documentation were submitted at the trial. Plaintiff's salesman Blecher testified that sales increased after the guard bars were added to plaintiff's gate, but he said:

> I don't keep, actually—I am not the bookkeeper. I don't know what it was —exactly how much, but I would say it could be 30 or 40 per cent increase. (Tr. 77).

Under these circumstances, plaintiff's proof concerning the extent of increased sales cannot be accorded much weight.

■ I have concluded that the secondary considerations discussed above do not support plaintiff's contention that his invention is nonobvious.

### Fraud—Antitrust Law Violations

■ Defendant's counterclaims charging plaintiff with fraud on the Patent Office, "inequitable conduct", and with violation of section 2 of the Sherman Antitrust Act, are not supported by the proofs. I have considered Walker Process Equipment Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), and United States v. Yellow Cab Co.,

332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1946), cited by defendant, and find those cases inapposite to the facts in this case. Accordingly, defendant's counterclaim under the antitrust laws ("second counterclaim") will be dismissed.

### Conclusion

■ It follows from the foregoing opinion that claims 1 and 2 of reissue patent No. 26,259 are invalid under 35 U.S.C. § 103 for obviousness.[19] This disposition of the patent's validity renders unnecessary a determination of plaintiff's claim of infringement.[20] Therefore, I express no opinion on whether the doctrine of equivalents or the doctrine of file wrapper estoppel applies to the facts in this case. The complaint is dismissed.

As to the counterclaims, defendant is entitled to a declaratory judgment of invalidity. However, the counterclaims are dismissed in all other respects.

Under all the facts and circumstances here, and since neither party has entirely prevailed, it is ordered that each party shall bear its own costs and expenses. Cf. Homestake Mining Co. v. Mid-Continent Exploration Co., 282 F.2d 787 (10th Cir. 1960); Q-Tips, Inc. v. Johnson & Johnson, 108 F.Supp. 845 (D.C. N.J.1952), aff'd 206 F.2d 144, cert. den. 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953).

This opinion includes the court's findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P.

Counsel for both parties are highly commended for the excellent manner in which they presented their respective positions in the case, and for conducting themselves in the finest traditions of our profession.

---

19. Claim 2 is the same as claim 1 except that the guard bars are described as having free ends "disposed for guidance" by the trackway on the central stile, rather than as in claim 1 "pivotally connected" "in overlapping relation" "in the trackway".

20. There can be no infringement of an invalid patent. Toro Manufacturing Corp. v. Jacobson Manufacturing Co., *supra*, 357 F.2d at page 904.

APPENDIX TO OPINION

Fig-1.    Fig-2.

[A5698]

Fig. 4.

Fig. 3.

Fig. 5.

Fig. 6.

[A5699]

Fig.-7

[A5700]

Fig.-8

[A5701]

Fig.-9

[A5702]

## Fig.-10

## Fig.-11

FIG.3.

[A5703]

What is claimed is:

1. A grille of the character described comprising a spaced pair of vertically disposed side stiles and a central intermediate stile; each of said stiles comprising a pair of spaced opposed channel irons connected together at the lower ends thereof, with the side flanges thereof extending inwardly toward each other, by pivot pins which extend through spacer sleeves interposed between opposed channel irons; a pair of guide bars one of which extends upwardly from the lower end of each of the channel irons of said central stile in spaced relation to the outer surface thereof with the upper and lower inturned ends of said guide bars connected to the adjacent channel bar, said guide bars defining a pair of trackways one on each side of said central stile; a lazy-tong grille work composed of a plurality of angularly disposed channel-shaped links arranged back to back with the flanges thereof presented outwardly and pivotally riveted together at their points of crossing and at the upper and lower ends thereof; said grille work extending between said side stiles through said central stile and pivotally connected to each of said side and central stiles; a front pair of longitudinally disposed straight flat bottom links, one of said bottom links having one end thereof pivotally connected to the forward surface of one of said side stiles at the lower end thereof by the pivot pin by which the lower ends of the channel irons of the said one of said side stiles are connected together and the free end thereof disposed within the said trackway on the forward side of said central stile, and the other bottom link of said front pair of bottom links having one end thereof pivotally connected to the forward surface of the other of said side stiles at the lower end thereof by the pivot pin by which the lower ends of the channel irons of the said other of said side stiles are connected together, and the free end thereof disposed within the said trackway on the forward side of said central stile in overlapping relation with the free end of the said one of said bottom links; a rear pair of longitudinally disposed bottom links which are similarly pivotally connected to the rearward surfaces of the said side stiles in transversely spaced relation to said front pair of bottom links with the free ends thereof disposed in the trackway on the rear side of said central stile in overlapping relation with each other; the overlapping free ends of each pair of bottom links being pivotally connected together and normally resting on lower inturned end of the guide bar defining the associated trackway; the lower inturned ends of said guide bars being disposed above the plane of said pivot pins whereby said bottom links are all inclined slightly upwardly toward said central stile from their pivotal connection with said side stiles; the lower pivotally connected ends of the channel links of said grille work being normally disposed within the space between the said front and rear pairs of bottom links whereby access thereto is prevented.

2. A grille of the character described comprising a spaced pair of vertically disposed side stiles and a central intermediate stile; each of said stiles comprising a pair of spaced opposed channel irons connected together at the lower ends thereof, with the side flanges thereof extending inwardly toward each other, by pivot pins which extend through spacer sleeves interposed between opposed channel irons; a pair of guide bars one of which extends upwardly from the lower end of each of the channel irons of said central stile in spaced relation to the outer surface thereof with the upper and lower inturned ends of said guide bars connected to the adjacent channel bar, said guide bars defining a pair of trackways, one on each side of said central stile; a lazy-tong grille work composed of a plurality of angularly disposed channel-shaped links arranged back to back with the flanges thereof presented outwardly and pivotally riveted together at their points of crossing and at the upper and lower ends thereof; said grille work extending between said side stiles through said central stile and pivotally connected to each of said side and central stiles; a front pair of longitudinally disposed straight flat bottom links, one of said bottom links, having one end thereof pivotally connected to the forward surface of one of said side stiles at the lower end thereof by the pivot pin by which the lower ends of the channel irons of the said one of said stiles are connected together, and the free end thereof disposed for guidance by the said trackway on the forward side of said central stile, and the other bottom link of said front pair of bottom links having one end thereof pivotally connected to the forward surface of the other of said side stiles at the lower end thereof by said pivot pin by which the lower ends of the channel irons of the said other of said stiles are connected together, and the free end thereof disposed for guidance by the said trackway on the forward side of said central stile; a rear pair of longitudinally disposed bottom links which are similarly pivotally connected to the rearward surface of the said side stiles in transversely spaced relation to said front pair of bottom links, with the free ends thereof disposed for guidance by the trackway on the rear side of said central stile; the lower inturned ends of said guide bars being disposed above the plane of said pivot pins, said bottom links in the lowermost position being inclined slightly upwardly towards said central stile from their pivotal interconnection with said side stiles; the lower pivotally connected ends of the channel links of said grillework being normally disposed within the space between the said front and rear pairs of bottom links, whereby access thereto is prevented.