Perry H. GENTZEL and Foster Engineering Company, Plaintiffs-Appellees,

v.

MANNING, MAXWELL & MOORE, Inc., Defendant-Appellant.

No. 205, Docket 23666.

United States Court of Appeals Second Circuit.

Argued Jan. 11, 1956.

Decided March 1, 1956.

Max R. Millman, Philadelphia, Pa. (Louis L. Ansart, New York City, and Caesar & Rivise and A. D. Caesar, Philadelphia, Pa., on the brief), for plaintiffs-appellees.

Stephen H. Philbin, New York City (Darby & Darby and Louis D. Fletcher, New York City, on the brief), for defendant-appellant.

Before CLARK, Chief Judge, and FRANK and LUMBARD, Circuit Judges.

CLARK, Chief Judge.

Plaintiffs, Perry H. Gentzel, the patentee of the two patents in suit, and Foster Engineering Company, the exclusive licensee under the patents, recovered judgment in the court below holding the claims of the patents valid and infringed and awarding an injunction and accounting for damages. A claim for alleged breach of confidential relations was dismissed. Only defendant appeals.

### Gentzel reissue patent 22,164

Gentzel reissue patent 22,164 for a "Valve Mechanism" was issued August 25, 1942, upon reissue application filed July 24, 1940; the original patent, 2,145,870, was issued February 7, 1939, upon application filed January 30, 1935. Judge Clancy held all six claims of the reissue patent valid and infringed by defendant's competing safety valves. The reissue patent concerns frame rods arranged to support the cross bar of a safety valve for steam boilers. The cross bar, in turn, anchors the upper end of a spring which, due to its state of compression between the valve and the cross bar, holds the valve shut until the desired "pop-off" pressure is achieved. Thus obviously any change due to temperature variations in the configuration of the cross bar and its supporting frame rods will result in a change in the compressive stress exerted on the spring, which, in turn, will cause a change in "pop-off" pressure. Such variations in "pop-off" pressure are highly undesirable, particularly in high-pressure, high-temperature boilers, since they result either in the maintenance of pressure at dangerously high levels or in waste of useful energy due to "pop-off" at needlessly low pressures. One of the major reasons for these unwanted variations stems from the fact that each time the valve pops various parts thereof are bathed in steam and, in the case of some boilers, in superheated steam. This overheating of various parts of the valve naturally causes changes in the pressure at which the valve will pop when next subjected to excessive pressure. The ob-

ject of Gentzel's patent is to prevent, by frame rods properly arranged, the increase in heat when the valve first opens from weakening the spring compression, and thereby causing the valve to open at lower pressures on its second and subsequent openings.

This, plaintiff Gentzel purports to do (1) by placing the two frame rods which support the cross bar a sufficient distance from the valve so as to minimize the heating effect of the discharged steam on the rods, (2) by securing the bottom of the frame rods to the valve casing at its end nearest the boiler at a sufficient distance from the initial opening of the valve so as not to be affected by the heat emanating from that point, and (3) by making the frame rods of sufficient length so that heat will not be conducted through them to the cross bar. Thus plaintiff Gentzel's claimed invention consists of the positioning, place of attachment, and length of the frame rods. In essence, his claim to inventive genius appears to lie in the idea that if one makes frame rods long enough and moves them far enough away from the source of the hot steam they and parts attached to them will not become undesirably hot.

An examination of the prior art, however, discloses that both the use of frame rods in safety valves and their length and positioning as prescribed by plaintiff's patent had been fully anticipated and disclosed by prior patents. So the Paine patent 102,147, issued in 1870, covers a safety valve employing frame rods similar to plaintiff's. It does not, however, have a valve casing; and the frame rods are affixed directly to the steam dome of the boiler, rather than to a casing. The fact that plaintiff, who employs rods of similar length and placement, does so in connection with a valve having a casing, rather than one without, does not render plaintiff's work patentable. It is mere routine mechanical development to use rods having a previously patented configuration in connection with a valve casing, which plaintiff does not claim to have invented, even though the use of the casing will reduce the quantity of steam which may potentially impinge upon the frame rods.

The Jackson British patent 3172 (1899) discloses a valve casing and frame rods secured at the lower end of the casing. Plaintiff seeks to distinguish this patent on the ground that the frame rods contain "shoulders" which "bear tightly against the top of the casing," thereby causing the rods to be affected by the elongation of the casing. Whatever the merits of this distinction, if the length and positioning of the frame rods in the Paine patent were combined with the valve casing and rods secured at its lower end as in the Jackson British patent, plaintiff's patent would be the result.

The McCarty patent 944,809 (1907–1909) discloses two frame rods which are roughly the same as those of plaintiff's reissue patent in respect to the three important aspects of the claims, to wit: anchorage, spacing, and length. Plaintiff asserts that the McCarty patent is distinguishable because a certain lever arm contained in that mechanism may be affected by heat expansion and thereby change spring stress. No claim is made, however, that under the scheme of the McCarty patent distortion would result from heating of the frame rods.

Without going into other cited patents of a cumulative effect here, we think it clear, therefore, that this Gentzel patent consists of a combination of elements, all of which were fully disclosed prior to its issuance. It is irrelevant that the inventors of prior devices failed to describe or appreciate all their advantages (in this case, the prevention of undesirable heating of the frame rods). Consolidated Bunging Apparatus Co. v. Metropolitan Brewing Co., 2 Cir., 60 F. 93, 97. It is enough that prior patents disclosed all the elements of plaintiff's patent and in fact, lacking only slight modification, the very combination of elements contained in plaintiff's invention. See Concrete Appliances Co. v. Gomery, 269 U.S. 177, 185, 46 S.Ct. 42, 70 L.Ed. 222; Cuno Engineering Corp.

v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58; Wrightway Engineering Co. v. Melard Mfg. Corp., 2 Cir., 219 F.2d 392. The somewhat more lenient standard of patentability expressed in Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530, as required by the recently enacted statute, 35 U.S. C. § 103, will not save this weak patent in a crowded field, since whatever advance plaintiff may have made over the prior art is both obvious and slight.

### Gentzel patent 2,278,437

■ Gentzel patent 2,278,437, issued April 7, 1942, on an application filed July 31, 1939, and of which eleven of its seventeen claims are here in issue, involves certain mechanisms which control the release of steam after the valve pops off. The steam in emerging from the nozzle of the valve causes a piston to rise. The piston is enclosed in a piston guide, along which it slides. Cut into the inner wall of the guide is a ring-shaped groove, described as an "annular recess" or "exhaust belt." Leading from the groove to the atmosphere are a series of four holes, also known as "ports" or "apertures," two of which are equipped with metering valves to control the flow of steam. As a further feature, the piston is serrated to prevent binding or "seizing." Judge Clancy has held all the claims here put in issue to be valid and infringed.

Plaintiffs assert that the two objectives sought to be achieved by their valve mechanism are (1) maximum lift or opening of the valve in the shortest possible space of time and (2) minimum "blowdown," i. e., differential between valve opening and closing pressures. In other words, the purpose is to have the valve open as abruptly and fully as possible and then close immediately after the boiler has returned to normal pressure. Plaintiffs intimate that *both* these desired ends are to be achieved through the action of the "annular chamber" and apertures. It appears, however, that in reality the quick lift is provided by a "huddling chamber"—a conventional device to build up pressure, made by extending the valve disk beyond its seat to afford additional area to be acted upon by the steam, and thus designed to take advantage of the jet action of the escaping steam in such a way as to force the valve to maximum opening.[1] The an-

---

[1] Plaintiffs' witness Stephen G. Farrington testified as follows on redirect examination:

"Q. Is there a huddling chamber in the Gentzel patent 2,278,437? A. Yes, sir.

"Q. Is there a huddling chamber in the Foster valves that are made in accordance with the Gentzel patent? A. Yes, sir.

"Q. Is there a huddling chamber in the defendant's valve, the Maxiflow valve? A. Yes, sir.

"Q. In the Gentzel patent and in the Foster valves, in addition to the huddling chamber there is an exhaust belt associated with the guide, apertures which are in communication with that exhaust belt and the apertures are controlled or metered.

"Is the function of a huddling chamber the same or different than the function of an exhaust belt and metering valves in communication therewith? A. They are not the same.

"Q. Why are they different? A. The huddling chamber effect of the nozzle ring causes a sudden lift, the restriction of the initial flow of steam causing

the lift of the valve. Once the valve has lifted, there is a considerable increase in the quantity of steam that passes therefrom, reaction and jet action take place on the piston, and in order to break down this high reaction and jet action caused by velocity flow under high flow of steam and great quantities, it is necessary to take part of that steam off through this exhaust belt arrangement which is adjustable for various conditions of flow in these valves and for different sizes of valves. They are not synonymous in any way, the two parts, the huddling chamber and the exhaust belt.

"Q. Is there a method of breaking down what you call the jet reactive force in the defendant's valve? A. Yes, sir.

"Q. And that's different from the huddling chamber? A. Different from the huddling chamber, yes.

"Q. And what parts of the defendant's structure perform that function of breaking down the jet action in the defendant's structure looking— A. The horizontal holes O that pass through this part No. 9. * * *"

nular recess · and apertures perform merely the function of breaking the jet action and dispersing the steam so as to provide prompt reseating of the valve without excessive blowdown. Since Gentzel makes no claim to have invented the "huddling chamber," the patentability of his device turns upon the question whether or not the prior art has anticipated his annular recess in its function of breaking down jet action and dispersing the steam so as to minimize blowdown.

The Coale patent 459,268 employs a groove and openings to permit the escape of steam. According to the specification, "[t]he area of these openings can be adjusted with great accuracy to permit the steam to escape from the pop-chamber at the necessary speed to insure the closing of the valve at the desired point." The groove in the Coale patent is cut in "an annular valve or ring," rather than in the valve guide as in the Gentzel patent. It is also true that in the Coale scheme the areas of exhaust holes are controlled by a ring, while Gentzel uses metering valves to perform the same function. Considering, however, the close similarity between the two patents both physically and functionally, these distinctions involve matters of engineering only, rather than invention.

The Houser patent 1,152,733 does not employ an annular recess or groove; but it does utilize exhaust ports through which steam may escape when the valve pops, thereby minimizing blowdown. Also the area presented for the escape of steam is adjustable. The Houser device therefore exemplifies the same principle as Gentzel's patent. Both patents seek to reduce blowdown by providing an additional outlet for the escape of steam into the atmosphere through adjustable areas of outlet. The fact that Gentzel also provides a groove or "annular recess" is not shown to affect the result achieved.

As for plaintiffs' claim based on the use of a serrated valve piston, this was anticipated by the Iwanowitsch patent 427,264 and also by the Coale patent 459,268. So we find this patent, like the other, to add at most only a slight refinement by rearrangement or repositioning of old elements to obtain a quicker or more uniform operation of the device. We do not see invention here. Since both patents are invalid so far as in issue before us, we do not reach the defendant's further contentions that the claims in the reissue patent 22,164 are unduly vague or that it did not infringe either patent.

We perhaps should note the usual argument for validity because of alleged commercial success. Beginning in 1939 or perhaps earlier, Foster Engineering Company, the sole licensee, has sold about 3,000 Gentzel valves at prices ranging from $300 to $1,000, or a total of $1,500,000, for which Gentzel has received royalty payments of about $90,-000. This somewhat modest success for a large operation over a long period does not carry conviction of unique worth. As we have again pointed out, Kleinman v. Kobler, 2 Cir., 230 F.2d 913, we must not be overnaive in evaluating such claims; and even a greater measure of success would not establish validity in the face of the clear showing here of anticipation by the prior art. Jungersen v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235, affirming Jungersen v. Baden, 2 Cir., 166 F.2d 807, 811. Of at least equal persuasiveness are the tortuous progress of these patents through the Patent Office from 1935 to 1942 and the many emendations of statement, especially in the second patent, made to meet the objections of examiners—a classic example of what Judge Learned Hand has called "the ant-like persistency of solicitors" which overcomes "the patience of examiners, and there is apparently always but one outcome." See Lyon v. Boh, D.C.S.D. N.Y., 1 F.2d 48, 50, reversed on grounds not here apposite, 2 Cir., 10 F.2d 30.

The complaint must be dismissed on the merits.

Reversed for dismissal.