**ROBINS INDUSTRIES CORP., Plaintiff,**

v.

**DAVID RIEMER CO., Inc., Defendant.**

United States District Court
S. D. New York.
Nov. 16, 1961.

Michael S. Striker, New York City, for plaintiff, Harry Price, New York City, of counsel.

Samuel J. Stoll, Jamaica, for defendant.

SUGARMAN, District Judge.

Plaintiff, Robins Industries Corp., sues David Riemer Co., Inc. for damages for patent infringement and for unfair competition. Two other defendants were dismissed at the opening of trial on plaintiff's motion. Defendant counterclaims for a declaratory judgment of invalidity and non-infringement.

Plaintiff, among other items, sells tape splicing devices for splicing sound recording tape. Plaintiff claims that defendant by selling a competing device substantially identical to plaintiff's product, infringes on plaintiff's rights under Patent No. 2,778,420, issued to E. Simon on January 22, 1957. This patent is owned by plaintiff.

The tape splicers sold by plaintiff and defendant are made in accordance with the Simon patent.

■ The claim of "unfair competition" is dismissed. The evidence discloses that defendant imports his splicers from Japan. It is beyond dispute that defendant's supplier copied plaintiff's device.[1] This alone is not an actionable wrong. There was no substantial evidence submitted to sustain a finding that plaintiff's product was identified in any person's mind with the plaintiff or any other source.

Aside from its patent hereinafter discussed, there was no proof to support any other theory which would give the plaintiff the right to be the sole maker or vendor of tape splicers of the design and configuration in suit. The "free ride" taken by defendant is permitted and encouraged by the law "[f]or the common law favors competition; and it is of the essence of competition that competitiors copy and undersell the product of an originator. The competitors do not lose their favored common-law position merely because someone chooses to call them 'free riders.' To have protection from such competition, the originator must possess some sort of monopoly".[2]

---

1. S.M., April 19, 1961, p. 132.

2. Chas. D. Briddell, Inc. v. Alglobe Trading Corp., 194 F.2d 416, 418 (2d Cir. 1952); cf. Mastercrafters C. & R. Co. v. Vacheron & Const.-Le C. W., 221 F. 2d 464 (2d Cir.1955).

We turn now to the patent claim.

The patent in suit, as noted above, relates to a device for use in the splicing of magnetic recording tape. In one operation the machine cuts laterally the ends of two pieces of magnetic recording tape to be joined. In a separate operation it trims off at the edges of the magnetic recording tape the excess of the pressure-sensitive adhesive splicing tape after the latter has been manually applied to the joint of the magnetic tape.

The device is simple and its function is readily apparent from a study of drawings which accompany the specification.

The claims of the patent in suit are five, to wit:

"1. A tape splicer comprising, in combination, a base member; a manually operable arm member; means connecting said arm member to said base member for movement with respect thereto toward and away from an operating position where a portion of said arm member is located over and adjacent to a portion of said base member; a pair of cooperating cutting elements respectively carried by said member at said portions thereof and directed toward and cooperating with each other when said arm member is in said operating position, said cutting elements respectively being in the form of an anvil and a cutter having three cutting blades, said cutter being carried by said arm member and said anvil being carried by said base member and having an anvil surface toward which the cutting edges of the cutting blades are directed when said arm member is in said operating position; positioning means forming a unit with said anvil and cooperating therewith for positioning a pair of tape portions in overlapping relation extending over a predetermined elongated anvil surface portion having a width equal to that of said tape portions; and means connecting one of said cutting elements to the member carrying the same for movement in a direction transverse to said elongated portion of said anvil surface between a pair of cutting positions, one of said cutting blades extending across said elongated anvil surface portion when said arm member is in said operating position and said one cutting element is in one of said cutting positions, for cutting off parts of the tape portions and forming abutting edges at the ends of the thus cut tape portions, and the other two cutting blades being spaced from each other by a distance approximately equal to the width of said elongated anvil surface portion and being respectively located approximately along the edges of said surface portion when said arm member is in said operating position and said one cutting element is in the other of said pair of cutting positions, for trimming from the tape portions an adhesive element joining the tapes together and extending beyond the edges of the tapes.

"2. A tape splicer as recited in claim 1 and wherein said positioning means is in the form of a pair of elongated channel members which are open at the top and which extend beyond and form extensions of said elongated anvil surface portion.

"3. A tape splicer as recited in claim 1 and wherein said other two cutting blades are arcuate and have convex faces directed toward each other, the intermediate portions of said other two blades being spaced from each other by a distance less than said width of said elongated anvil surface portion and the ends of one of said two cutting blades being spaced from the ends of the other of said two cutting blades respectively by distances greater than said width so that said other two cutting blades trim away portions of the tapes at the ends thereof.

"4. A tape splicer as recited in claim 1 and wherein said arm member is the member carrying said one cutting element, so that said one cutting element is said cutter.

"5. A tape splicer comprising, in combination, a base member; a manually operable arm member pivotally connected at one end to said base member for turning movement with respect thereto downwardly toward and upwardly away from an operating position where a portion of said arm member is located over and adjacent to a portion of said base member; a cutter having three cutting blades carried by said arm member at said portion thereof; an anvil carried by said base member at said portion thereof and having an anvil surface toward which the cutting edges of the cutting blades are directed when said arm member is in said operating position; positioning means cooperating with said anvil for positioning a pair of tape portions in overlapping relation extending over a predetermined elongated anvil surface portion having a width equal to that of said tape portions, said anvil surface portion being substantially parallel to the turning axis of said arm member and being located beneath said portion thereof when said arm member is in said operating position; and means connecting said cutter to said arm member for movement in a direction transverse to said elongated anvil surface portion between a pair of cutting positions, one of said cutting blades extending across said elongated anvil surface portion when said arm member is in said operating position and said cutter is in one of said cutting positions, for cutting off parts of the overlapping tape portions and forming abutting edges at the ends of the thus cut tape portions, and the other two cutting blades being spaced from each other by a distance approximately equal to the width of said elongated anvil surface portion and being respectively located approximately along the edges of said surface portion when said arm member is in said operating position and said cutter is in

the other of said pair of cutting positions, for trimming from the tape portions an adhesive element joining the tapes together and extending beyond the edges thereof."

In support of its contention that the patent is valid, plaintiff argues in its brief after trial at pages 4 and 5:

"1. The shiftability of the cutter unit which carries the blades. Thus, it will be seen that claim 1 of the Simon patent calls for a 'means connecting one of said cutting elements to the member carrying the same for movement in a direction transverse to said elongated portion of said anvil surface between a pair of cutting positions'. Also, it will be seen that claim 5 of the Simon patent calls for a 'means connecting said cutter to said arm member for movement in a direction transverse to said elongated anvil surface portion between a pair of cutting positions'.

"2. The second principal point of novelty is the configuration of two of the cutting blades which give the spliced tape the 'Gibson Girl' shape. Thus, it will be seen that claim 3 of the Simon patent calls for a structure 'wherein said other two cutting blades are arcuate and have convex faces directed toward each other, the intermediate portions of said other two blades being spaced from each other by a distance less than said width of said elongated anvil surface portion and the ends of one of said two cutting blades being spaced from the ends of the other of said two cutting blades respectively by distances greater than said width so that said other two cutting blades trim away portions of the tapes at the ends thereof'.

"3. The third principal point of novelty is the arrangement of the turning axis of the pivoted arm so that this axis extends parallel to the anvil. Thus, it will be seen that claim 5 of the Simon patent requires 'said anvil surface portion being sub-

stantially parallel to the turning axis of said arm member'."

Preliminarily, it is to be observed that not one of these three points was argued to the Examiner as the primary basis of invention during the tortuous journey of the matter through the Patent Office. A reading of the file wrapper of this patent recalls Judge Hand's reference in Lyon v. Boh,[3] D.C., 1 F.2d 48, to the "antlike persistency of solicitors".

Excerpts from substituted counsel's "Remarks" on the Examiner's action in rejecting claims presented by his predecessor are as follows:

"It is believed that the Examiner errs in the basic premise from which he starts in order to reject the claims. * * * The concept of cutting the tape in a particular manner which is not shown or suggested anywhere in the prior art is itself inventive and the Examiner goes too far in ignoring the particular manner in which the claimed structure cuts the tapes. If the Examiner is at all familiar with the manner in which recording tapes are conventionally spliced at the present time, it is not seen how he can fail to appreciate the high degree of invention involved in the basic concept of providing a structure which will cut the tape in the manner that a tape is cut by the claimed structure.

"At the present time conventional tape splicers consist only of a block on which the tape ends which are to be spliced together are placed. This block is provided with a guide for a razor blade which the operator must hold in his hand in order to cut through the tapes to be spliced. After cutting the tapes with such a razor blade, the operator must place an adhesive element on the two tapes, and then the operator must take a scissors and manually trim the splice without any guides whatsoever. The great inconvenience involved in this conventional splicing arrangement as well as the danger present when using a razor blade is believed to be self-evident that further demonstration of the disadvantages of conventional splicing is believed to be unnecessary.

"In contrast, with the claimed structure the tapes to be spliced are placed on the anvil and the arm with the diagonal cutting blade position over the tapes is brought down quickly and easily to provide the desired abutting edges at the ends of the tapes. Then an adhesive is placed on these abutting ends and after the cover is shifted the arm is again brought down to trim the spliced tape in one quick simple operation. When it is realized that with the structure of the invention, as recited in the claims, the necessity for using a razor blade and scissors is completely eliminated and when it is realized that with the structure of the claims a reliable professional splice is provided in a quick convenient manner, then it is evident that the present invention provides a great and highly meretorius [sic] advance and for the first time fills a great need, so that the patentability of the claims is believed to be clearly warranted.

"As for the prior art, there is not a single reference of record which even remotely resembles the claimed structure. * * *

" * * * the plain fact is that there is no structure anywhere in the prior art capable of providing abutting edges at the ends of a pair of tape portions to be spliced.

" * * * Where is there the least suggestion anywhere in the prior are of providing a diagonal cut off blade? Where except from the instant application does the Examiner himself obtain the least hint of the desirability of such a blade? * * *

3. See Gentzel v. Manning, Maxwell & Moore, Inc., 230 F.2d 341, 345 (2d Cir. 1956).

" \* \* \* Attention is invited to the fact that the claims submitted herewith call for a positioning means cooperating with the anvil for positioning tapes to be spliced in overlapping relation. Where is such a positioning means shown or suggested in the prior art?

"The above arguments are believed to clearly demonstrate basic novelty of the structure recited in the claims, as well as the highly unobvious and advantageous results capable of being produced by this novel structure. With the claimed structure one blade provides the abutting edges at the ends of the tapes to be spliced and the other two blades carry out the trimming operation."

The argument that carried the field in the Patent Office then is not the configuration of the trimming blades to produce the "Gibson Girl" shape but rather is fairly summarized in the inventor's contention:

"The prior art shows no structure capable of providing abutting edges at the end of strip to be spliced and shows no trimming structure. Thus, even the basic inventive concept of the instant application is not shown in the prior art."

It is true that the claimed "basic inventive concept" was not shown in the prior art considered by the Examiner. However, apparently unknown to the Examiner a device made in accordance with Simpson Patent No. 2,660,221 is just such a device and it anticipated the accomplishments of the patent in suit in both respects of cutting and trimming.

■ Assuming that plaintiff is not "estopped" by virtue of its contentions in the Patent Office proceedings, the court is satisfied that the patent is nevertheless invalid for want of invention or by reason of anticipation.

## I.

The shiftability of the cutter unit which carries the blades was presented to the Examiner as a feature of the invention embodied and claimed in the pending application.

"Furthermore, with the claimed structure the anvil and cutter are shiftable *one with respect to the other*. Where does the prior art fairly suggest this feature? As was pointed out above elements 33 and 35 of Collins always remain in vertical alignment. The stationary cutters 29 and 30 of Wittel always remain in the same position with respect to element 25. It is not a question of shifting cutters with respect to a narrow sheet so that some cutters will miss the sheet. The point is to have the cutters and anvil shiftable one with respect to the other while maintaining the tapes being spliced stationary with respect to the anvil so that the abutting relationship of their end edges provided by the diagonal cutting blade is not in any way disturbed. \* \* \*"

Claim 2, which was at first rejected and ultimately cancelled by the applicant, was—

"The device as defined in Claim 1, wherein the operating arm is swingably mounted on the base and wherein the member carrying the blades is slidable on the operating arm."

■ The cancellation of this claim as a matter of law defeats the first argument of invention in this action.[4]

In any event, the provision of a mount for several tools which mount might be selectively positioned to bring into effect on the work one of the tools was not new.

The Examiner rejected Claim 2 on the disclosures of Wittel Patent No. 1,804,-730, in view of Rauber Patent No. 1,742,-216 and Collins Patent No. 1,407,257. The long familiar slidable shoe on the

---

4. Miller v. Zaharias, 72 F.Supp. 29 (E.D.Wis.1947), aff'd, 168 F.2d 1, cert. denied, 335 U.S. 823, 69 S.Ct. 47, 93 L.Ed. 377.

ordinary stapler likewise utilizes this concept.[5]

In the light of the foregoing and Simpson Patent No. 2,660,221, any person skilled in the art might have conceived the device for which plaintiff claims protection under the Simon patent to the extent it contains a slidable tool holder.

## II.

There is no invention in the use of the arcuate configuration of two of the cutting blades which give the spliced tape the "Gibson Girl" shape.

Prior to the alleged invention—

" * * * conventional tape splicers consist only of a block on which the tape ends which are to be spliced together are placed. This block is provided with a guide for a razor blade which the operator must hold in his hand in order to cut through the tapes to be spliced. After cutting the tapes with such a razor blade, the operator must place an adhesive element on the two tapes, and then the operator must take a scissors and manually trim the splice without any guides whatsoever. * * * "[6]

It is clear to the court that any person performing the trimming operation with scissors would do so in such a manner as to naturally achieve an arcuate cut as opposed to a straight cut even without an intention of eliminating possible burrs. Plaintiff does not claim invention in the "Gibson Girl" shaped cut[7] although he does claim invention in the arcuate blades which achieve the result. Stevens Patent No. 1,625,403 showed rounded blades to round off the severed ends of material. It cannot be said to require the inventive faculty to use an obvious means to attain a known result.

## III.

The arrangement of the turning axis of the pivoted arm so that this axis extends parallel to the anvil is old in the art. It was anticipated by, *inter alia*, Bogopolsky Patent No. 1,851,800, Spiros Patent No. 1,781,200 and Gavin Patent No. 2,250,194.

Neither separately nor in combination do the claimed elements of the Simon Patent rise to "invention". The patent is *invalid*.

The foregoing constitutes the court's findings.

I conclude:

1. The Simon Patent in suit, No. 2,778,420, is invalid and not infringed.

2. Defendant is not engaging in unfair competition with the plaintiff.

3. Defendant is entitled to judgment dismissing the complaint, with costs but without attorneys' fees.

5. Plaintiff's first model appears to have been constructed by use of parts of a "Bostick [Bostitch?] stapling" machine. Ex. 46, p. 109.

6. File Wrapper, p. 29.

7. S.M., April 21, 1961, pp. 250, 251.