CLEMENTS INDUSTRIES, INC. and
Ben Clements & Sons, Inc.,
Plaintiffs,

v.

A. MEYERS & SONS
CORP., Defendant.

No. 87 CIV 3971 (LBS).

United States District Court,
S.D. New York.

April 14, 1989.

Blum Kaplan, New York City (Lawrence Rosenthal, of counsel), for plaintiffs.

James and Franklin, New York City (Harold James, of counsel), for defendant.

## OPINION

SAND, District Judge.

On March 9, 1988, in an Opinion with which full familiarity is assumed, this Court held that there was no meeting of the minds on April 20, 1983, when the parties purported to enter into a settlement agreement of litigation then pending before Judge Milton Pollack of this Court. Accordingly, the settlement agreement was set aside. The parties engaged in further discovery and have now tried to the Court a host of patent, trademark, unfair competition, antitrust and other issues. The parties have agreed that all matters in contro-

versy between them are now ripe for adjudication except issues relating to damages and applications under Rule 11 and other provisions for costs and sanctions.

The issues resolved by this Opinion, which sets forth the Court's findings of facts and conclusions of law pursuant to F.R.Civ.P. 52(a), are the following:

I. Whether, as plaintiffs assert, the defendant's sale of its Super Sabre tag attachment having a round or full-moon paddle infringes claims 6 and 7 of U.S. Patent No. 4,347,932; whether, as defendant asserts, said patent is invalid in its entirety, void and unenforceable against defendant; or whether said patent was obtained as a result of inequitable conduct. Defendant concedes that if the patent is valid, defendant is an infringer. Subsequent to the commencement of this litigation, plaintiffs disclaimed claim 5 of the Patent. Plaintiffs do not claim that claims 1–4 have been infringed, but defendant asserts the validity of these claims is also at issue.

II. Whether defendant's importation and sale of various tag attaching guns (Pioneer, KW–2000, Laser, Lozio, Target Tagger, and certain guns with no identification of manufacturer or source) should be enjoined as embodying or being confusingly or deceptively similar to the registered shape of the Clements' tag attaching gun (Reg. No. 1,424,615). Whether said trademark registration is invalid and should be cancelled.

III. Whether defendant's use of a fan-shape depiction of tag attachments in advertising and promotional material constitutes unfair competition or misappropriation of any right of the plaintiffs. Whether defendant's advertising claims that the "Super Sabre full moon" attachment was the "first designed to avoid tag switching" and that such attachments "have a Unique Half–Moon designed button in 2" and 3" lengths" constitute false advertising injurious to plaintiffs.

IV. Whether plaintiffs, in conjunction with an Italian attachment gun manufacturer (Lozio), have interfered tortiously with defendant's rights, violated the Sherman and Clayton antitrust laws of the United States and committed acts of unfair competition.

All other issues raised by the parties and embodied in the pretrial order signed on December 29, 1988 relate to damages, costs or sanctions and have been deferred to a later stage of these proceedings. The statement of facts not in dispute as set forth in said pretrial order is adopted and incorporated by reference herein.

We address the issues raised seriatim.

## BACKGROUND

As we noted in our March 9, 1988 Opinion, both parties are engaged in the business of importing and selling tag attaching systems. Such systems constitute a significant aspect of plaintiffs' business and a relatively minor portion of defendant's business. The relations between the parties are acrimonious. The causes of this acrimony are varied. For example, Plaintiffs believe that defendant persists in resisting plaintiffs' litigation claims because defendant's litigation costs, unlike plaintiffs', are reimbursed by insurance. Although this and other like bones of contention between the parties have no relevance to the issues in this case, they furnish some insight into the reason why so many claims have been made in this litigation and pursued with a vigor which often appears disproportionate to their commercial significance.

## DISCUSSION

### I. *Patent Issues*

In response to plaintiffs' patent infringement cause of action, defendant contends that the patent-in-suit, and each of the claims thereof, is invalid because of prior art. For the patent to be valid, the invention must meet the statutory requirements of utility, novelty and non-obviousness. 35 U.S.C. §§ 101–103. Defendant has argued that anticipation or obviousness preclude a finding of novelty. Based on the facts before us, we find that claims 1–4 of the Clements patent are not novel because of

obviousness and claims 6 and 7 are not novel because of anticipation.[1]

Defendant has met its required burden of proving the facts establishing the patent's invalidity by clear and convincing evidence. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The usual presumption of patent validity, 35 U.S.C. § 282, is here significantly undercut because the applicant erroneously advised the Patent Examiner that certain prior art did not involve clips but rather, contained only single attachments. Further, it appears that applicant's assertion to the examiner that it could not furnish samples of other alleged prior art because the prior patent was never exploited commercially was also erroneous even if made in good faith.[2]

The prior art at issue is an attachment device developed by Dennison in the 1960's. It enables price tags to be attached to garments before sale to the public by means of a tagging gun. Each fastener contains a thin strip of plastic filament with a small transverse bar (perpendicular to the filament) at one end and a round paddle at the other.

Plaintiffs assert that the Dennison device was never commercially marketed and that the exhibits introduced at trial appear to be crude non-production models. We reject this claim. The deposition of the inventors, who were Dennison employees, satisfies us that the production and marketing of this device was an event which in fact occurred and was regarded by the inventors as a memorable occasion.

Dennison developed and marketed the device at a time when the state of the art did not include the concept of stretching the filament after removal from the mold to enhance flexibility. Thus, Dennison used a round paddle at a time when tangling was not a serious concern. Subsequent to Dennison's development of the device, Dennison patented (and later disclaimed) the stretching process. Increased flexibility increased the tangling problem. By this time the industry was using other shapes for the end of the filaments, and Dennison attempted to deal with the tangling problem by connecting the paddle ends in each clip with thin plastic. These connected paddles created other problems, however, such as requiring an additional motion by the operator and leaving a protuberance where the connector was broken which sometimes caused snagging.

Clements' claimed invention is the use of a half-moon shape on the flexible filament as an anti-tangling device. Plaintiffs admit in their Summary of the Invention that the Dennison fasteners constitute prior art but state that their invention removes the above-mentioned drawbacks of the prior art.

Plaintiffs assert that the shape of its paddle, a "continuously arcuate slope," in combination with the thinner filament, prevents the jumbling of the fasteners and the enlarging of the tag hole and constitutes a patentable improvement. Yet these alleged structural improvements must fail. The arcuate shape of the paddle, even if we read the word "convex" into the claim as plaintiff urges, has not been shown to prevent tangling any more effectively than a paddle with straight edges. (Deposition of Mr. Furutu at 98). Clements' illustrations depict paddles with both curved edges and straight edges, and the wording of the patent expresses no preference for straight or curved edges. The patent does not claim that straight edges will tend to enlarge the tag hole and continuously arcuate edges

---

**1.** Plaintiff filed a statutory disclaimer of claim 5 with the U.S. Patent Office on June 16, 1988, stating that "claim 5 of said letters patent is too broad or invalid based on a just recently completed investigation of the prosecution file histories and prior art cited therein. . . ." We therefore discuss claim 5 only insofar as it relates to the other claims-in-suit.

**2.** Our conclusion that the patent is invalid because of obviousness and anticipation makes it unnecessary to determine whether inequitable conduct in the application process would invalidate an otherwise enforceable patent. We note these two instances of erroneous representations to the examiner merely to demonstrate that the usual presumptions of validity once a patent has issued are here significantly undermined.

will not, and there is no evidence that this is so.

As for the improvement on the filament, we look to claim 7 of the patent which refers to the filament by stating "wherein said filament is flexible." If there is to be an improvement on the filament, it would have to come from the word "flexible" alone since this is the only description of the filament in the claims. On this point, plaintiffs urge us to give the term flexibility in claim 7 a broad meaning to encompass the development of more flexible filament since the original Dennison attachment was produced. They cite the liberal interpretation given to the term by the court in *Harrington Manufacturing Co., Inc. v. White*, 475 F.2d 788 (5th Cir.1973), in support of their position. In that case, the term "flexible interconnection device" was given a broad meaning to encompass a rigid device among more flexible ones because all of the devices were intended to be covered by the patent. However, as defendant contends, adherence to *Harrington* produces a result opposite to that desired by plaintiffs. Such a reading means that the Dennison attachments, though not as flexible as later models, would also have to be considered flexible and would necessarily negate Clements' asserted improvement. Even without reading the claim broadly, the single word "flexible" is insufficient to distinguish the filament from the Dennison filament.

Moreover, plaintiffs' interpretation is belied by the patent's Summary of the Invention wherein it is stated that the improvement over the prior device comes from the "funnel-like shape [of the paddle] in which as the center portion of the edge approaches both sides of the head portion, it gradually slopes away from the transverse bar." No mention is made of the increased flexibility of its filament as part of the patentable improvement. In light of the detail with which the paddle was described in the claims, it is plausible to conclude that if plaintiffs believed that the thinner filament was part of the patentable improvement, they would have stated so more carefully, both in their summary and in the claims. This lack of elaboration, in combi-

nation with the fact that some degree of flexibility was present in the prior art, leads us to conclude that the flexible filament does not constitute a patentable improvement on structure.

Finally, we do not think that the functional language in the Clements patent describing the anti-tangling feature constitutes a patentable improvement. We are aware that functional language such as that here at issue ("permitting easy removal of a single tag pin from the assembly and removal of an assembly of tag pins ...") is allowed in claims and is entitled to full weight in claim analysis. *In Re Swinehart*, 439 F.2d 210 (C.C.P.A.1971). However, that language is all that sets the claims at issue apart from the Dennison device, and as the court in *Swinehart* stated, "It is elementary that the mere recitation of a newly discovered function or property, inherently possessed by things in the prior art, does not cause a claim drawn to those things to distinguish over the prior art." *Id.* at 212–13.

Clements attempts to distinguish its device from that of Dennison by stressing that Dennison did not recognize that the round paddle had the advantage of minimizing the tendency of groups of fasteners to tangle. Because Clements did recognize the value of the round paddle and did state this value in its claim, Clements argues that its patent was not anticipated by the Dennison prior art.

 Clements' argument, however, cannot be sustained. It is a basic principle of patents that an inventor is entitled to every use of which the invention is susceptible, whether those uses are known to the inventor at the time of invention or not. *In re Thuau*, 135 F.2d 344 (C.C.P.A.1943). It is irrelevant that the inventor fails to describe or appreciate the advantages of the invention in the patent application. *Gentzel v. Manning, Maxwell & Moore, Inc.*, 230 F.2d 341, 343 (2d Cir.1956); *Udin v. J. Kaufman Iron Works, Inc.*, 342 F.Supp. 1090, 1099 (S.D.N.Y.1972). If the construction disclosed in the prior patent would inherently accomplish the purpose of the

patent-in-suit, then the later patent cannot stand. *In re Smith*, 262 F. 717 (D.C.Cir. 1920).

In *Gentzel v. Manning, Maxwell & Moore,* the court held a patent for a "valve mechanism" and a "safety valve construction" invalid based on prior art because plaintiff had—except for some slight modifications—simply stated in its patent that it produced its product in the way it did because it would prevent undesirable heating of the frame rods in the valves. 230 F.2d at 343. The fact that plaintiffs' patent stated something which the prior art patent had not stated but had been capable of accomplishing all along was held insufficient to sustain a patent. The court wrote: "It is enough that prior patents disclosed all the elements of plaintiff's patent and in fact, lacking only slight modifications, the very combination of elements contained in plaintiff's invention." *Id.*

In *Udin v. J. Kaufman Iron Works,* the court also invalidated a patent which disclosed an advantage of its product which the prior art had not disclosed. The case involved protective grilles for windows, and the plaintiff's patent disclosed in its patent that its grille (which also had some slight modifications) could be used to protect the bottom of the grilles from burglars. The court invalidated the patent even though the prior patent at issue had not even addressed itself to the problem of burglars tampering with the lower parts of the grilles. 342 F.Supp. at 1099. The court found that the prior art suggested the use of protective bars to cover the lower ends of the grillework and that the function of the bars on both gates was "inherently the same." *Id.*

In the case at bar, plaintiffs stated in their Summary of the Invention that their fasteners have the advantage over the Dennison prior art of preventing tangling. However, an examination of the two products reveals that plaintiffs have only recognized an inherent advantage of the Dennison fastener which Dennison failed to recognize itself. If one were to use the Dennison paddle with the longer filament, the Dennison paddle would very easily be able to prevent tangling in the same manner as the Clements paddle. All that can be said about the difference between Dennison's round paddle and plaintiff's more rectangular one is that there has been a slight change in shape made by plaintiffs.[3] This change of paddle shape does not even represent an improvement as did the modifications in *Gentzel* and *Udin* since both paddles have been shown to be capable of preventing tangling when used with the flexible filament.

Moreover, as *Udin* teaches, the fact that Dennison did not address itself to the problem of tangling will not weaken defendant's inherency claim. First, as with the two grilles in *Udin,* the functions of the two devices—inserting tags through garments—are inherently the same. Second, the prior art clearly suggests the use of some degree of flexibility in its filament, and Clements' claim 7 ("wherein said filament is flexible") does not attempt to patent an improvement on that flexibility. Under these circumstances, the fact that Dennison's patent discloses the combination of a transverse bar, stretch of filament and round paddle does not enable Clements to enforce a patent on the virtually identical combination of elements just because it disclosed the use of such combination for preventing tangling. *See Udin,* 342 F.Supp. at 1099.

 Plaintiffs' invocation of the doctrine of accidental or unanticipated anticipation is inapposite to this case. Plaintiffs are correct in stating that if an invention produces accidental or unintended results, the character and function of which are not recognized until later, there is not anticipation for a later patent on that result. However, as the cases applying this doctrine

---

**3.** Indeed, it is somewhat ironic that plaintiff strenuously attempts to distinguish its half moon paddle from Dennison's round one while at the same time claiming that defendant's full moon paddle has infringed the half moon design. As well-stated by one court, "A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement." *Sterner Lighting, Inc. v. Allied Electrical Supply, Inc.,* 431 F.2d 539, 544 (5th Cir.1970), *citing White v. Dunbar,* 119 U.S. 47, 51, 7 S.Ct. 72, 74, 30 L.Ed. 303 (1886).

have consistently held, what that requires is true fortuitousness, as in the example of a chemical being produced as a side effect to no one's knowledge. *Tilghman v. Proctor,* 102 U.S. 707, 26 L.Ed. 279 (1880). It does not apply to structures or processes such as the Dennison round paddle which are consciously made but which may produce certain benefits or effects unbeknownst to the inventor. *Id.*

■ Plaintiffs cite the leading case of *Tilghman v. Proctor* in support of its accidental anticipation argument, but the case is distinguishable. In *Tilghman,* the Supreme Court upheld a patent on a discovery of how to form and use fatty acids while making candles. The Court dismissed the arguments of certain candle makers whose processes for soap and candle making had resulted in the formation of fatty acids because these candle makers had no intention of producing fatty acids and no idea that they had produced these acids until the plaintiff made his discovery. 102 U.S. at 711, 26 L.Ed. 279.

In the case at bar, while Dennison may not have appreciated the significance of the round paddles, it certainly knew that it was making fasteners with round paddles. In no way can it be said that, as in *Tilghman,* Clements came along and figured out how to make something which no one at Dennison even knew was being produced. Even if we accept plaintiffs' contention that some key people at Dennison were unaware of the precise shape the paddles took upon production,[4] the round paddle was not just accidentally formed as in the case of the *Tilghman* fatty acids. At most, the illustration of Dennison's engineer differs only slightly from the attachments as finally produced and this difference is not significant enough to constitute an accidental or unintended result.

4. Plaintiffs point to the differing paddle shapes appearing in the patent application as support for the claim that the paddle shape was irrelevant to the Dennison invention. Some of the distortions may be simply the result of perspective. In any event, there can be little question but that the devices received in evidence (Exhibits C and SW) have round paddles.

The case at bar is more analogous to *Bird Provision Co. v. Ownes Country Sausage, Inc.,* 568 F.2d 369 (5th Cir.1978), which invalidated a patent on a process of preparing and packaging fresh pork sausage. There, the court distinguished the fortuitousness in *Tilghman* and stated:

The prior users did not employ the process by chance. They were not unaware of the fact that they had hot-processed the meat into saran and other air-permeable containers. That the prior public users did not understand or appreciate the shelf life implications of the process did not save the Bird Provision patent from anticipation under § 102(b), for the discovery of the process' shelf life implications involved nothing that was new in its use or method of application.

568 F.2d at 375.

Dennison similarly did not make its paddles round by chance. The fact that Dennison did not understand or appreciate the implications of its round paddle will not sustain a patent issued to someone who did recognize those implications.

We thus accept Meyers' argument that Clements' patent was invalid because of prior art and now explain why each of the individual claims is invalid.

■ Claims 1–4 describe the transverse bar-like projections which appear on the head portions of the fasteners.[5] Claim 1 describes

a transverse bar-like projection, said transverse bar-like projection being positioned approximately mid-way of the longitudinal height of said head portion and coinciding with the largest head width, thereby assuring that the head portion maintains its maximum width, and permitting the use of a relatively thin head portion while preventing deformation of the head portion.

5. Claim 1 also describes the paddle attachments described in claim 5; however, since claim 5 has been disclaimed, we need only discuss that which distinguishes claim 1 from disclaimed claim 5.

Claim 2 adds the limitation that the bar-like projection "is substantially aligned with the bar-like projection of adjacent tag pins thereby assuring a space between adjacent tag pin solid head portions in the tag pin group." Claim 3 adds the limitation "wherein said edge opposite said transverse bar portion is formed by two curved lines which gradually reduce the distance there between while approaching the intersection of said filament portion with head portion." And claim 4 adds the limitation that "said head and transverse bar portions are substantially more rigid than said filament portion."

We find that claims 1–4 are invalid because they would have been obvious at the time the invention was made to a person having ordinary skill in the art. 35 U.S.C. § 103. Transverse barlike projections have been standard in fasteners since Dennison first developed them in the 1960's. Merser British Patent No. 950,402 calls for *"a bar, a button and a single filament joining the bar and button"* (emphasis added). An accompanying illustration, Figure 1, depicts a transverse bar just like Clements' transverse bar. Merser U.S. Patent No. 3,765,-110 calls for *"a bar* joined to the unstretchable section *in a generally T-shaped arrangement"* (emphasis added). The illustrations also show a transverse bar. Bone Patent No. 3,470,834 calls for "a transverse bar on one end of the filament." Although Clements' patent describes its transverse bar with language not present in the prior art references, the bars still appear precisely the same as Dennison's. They clearly would have been obvious to someone skilled in the art.

In reaching this conclusion, we are also persuaded by the prosecution history of the Clements' patent. When Clements applied for its patent, it denied the patent examiner information that transverse bar-like projections were known in the prior art. We conclude that if the examiner had been aware of this fact, claims 1–4 would not have been allowed.

■ Claims 5–7 describe the shape and function of the paddles and of the connecting filament. Claim 5, which plaintiffs have disclaimed, states that the paddle is

formed to slope away [from the transverse bar] continuously ... the sloped edge portion forming an obtuse angle with said filament ... permitting easy removal of a single tag pin from the assembly and removal of an assembly of tag pins from an intermixed group of assemblies of tag pins.

Claim 6 depends from claim 5 and requires that the head of the attachment be "a continuously arcuate slope." Claim 7 depends from claim 5 or 6 and adds the limitation "wherein said filament is flexible."

Defendant alleges that there are several prior art references that individually anticipate claims 5, 6 and 7. To maintain these contentions, it must be shown that each and every element as set forth in the particular claim is found, either expressly or inherently described, in a single prior art reference. *Verdegaal Bros., Inc. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed.Cir.1987).

Defendant alleges that claims 5 and 7 were expressly or inherently described in Olsen Patent No. 3,765,110; that claims 5, 6 and 7 were expressly or inherently described in Merser British Patent No. 950,-402; that claims 5, 6 and 7 were expressly or inherently described in Merser U.S. Patent No. 3,931,667; that claims 5, 6 and 7 were expressly or inherently described in Reiger Patent No. 3,273,705; and that claims 6 and 7 were expressly or inherently described in Bone Patent No. 3,470,834 and Merser Patent No. 3,399,432.

We find that claim 6 is anticipated by Bone Patent No. 3,470,834 and by Merser Patent No. 3,399,432, both of which call for edges with continuously arcuate shapes. Figures 7 and 8 of the Bone Patent and Figures 15 and 16 of the Merser Patent disclose paddles with continuously arcuate edges. Though the degree of sloping in the Clements paddle and the prior art references may differ slightly, we have previously determined that this difference does not constitute a patentable improvement.

In reaching this conclusion, we are again persuaded by the prosecution history. During the prosecution of its first application, Serial No. 727,234, Clements disclosed a paddle with a straight edge. In response to Olsen's disclosure of a straight edge, Clements filed a second application with claims requiring a curved edge. In the third application, Clements attempted to recapture claims disclosing the straight edge. Although Clements now contends that straight edges produce the tangling effect and continuously arcuate edges do not, this history belies such a claim.

Clements contends that the "arcuate" limitation in claim 6 should be interpreted as meaning "convex arcuate" in view of the arguments made by it during prosecution of the patent application and because of an instruction contained in claim 1 stating that the invention forms "a convex release means...."

The claim language does not support plaintiffs' reading because the claim does not require that the word "convex" be read into it. The language of the claim is clear and unambiguous. While we recognize that the instruction contained in claim 1 might logically apply to claim 5, we have previously held, p. 6, *supra,* that even a convex arcuate slope will not distinguish the Clements' device from the prior art. We adhere to the rule that when one patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement. *See SRI v. Matshushita Elec. Corp. of America,* 775 F.2d 1107, 1122 (Fed.Cir.1985). The prosecution history, prior art, and specification do not change this conclusion. *See SRI,* 775 F.2d at 1122 (stating that claims are to be construed in light of the claim language, other claims, prior art, prosecution history and specification). ·

We further find that claim 7, which added the limitation "wherein said filament is flexible," is anticipated by Olsen Patent No. 3,765,110, Merser British Patent No. 950,402, and Bone Patent No. 3,470,834. Olsen's patent in claim 1 calls for "[a] one-piece, *flexible,* plastic, molded, security-type fastener for attaching a tag to merchandise" (emphasis added). The Olsen Summary of the Invention states: "The fastener has a filament which is preferably but not necessarily *stretched "* (emphasis added). Similarly, the British Patent in claim 2 calls for a "tag attachment comprising, as parts of an integral structure of *flexible* synthetic plastic material, a bar, a button, and a single filament joining the bar and button" (emphasis added). Bone's patent calls for a fastener "having a *flexible filament* with a transverse bar on one end of the filament" (emphasis added). Though the actual degree of flexibility in these prior art references and in Clements' filament may differ, these prior art references clearly disclose flexibility as part of their inventions. Because Clements' patent did not distinguish its flexibility in any way from the prior art, Clements' claim 7 is expressly or inherently described by each of these prior art references.

To summarize, we conclude that defendant has met its burden of showing that claims 1–4 are invalid because of obviousness and 6 and 7 are invalid because of anticipation.

## II. *Gun Trademark Issues*

The tag attachments discussed above are inserted through the tag and the product being sold by means of an attachment gun. The clip of attachments is inserted into the gun and the operator by pulling the gun trigger, causing the attachment to be detached from the clip and inserted through the tag and the product being tagged.

Subsequent to the Consent Order entered into before Judge Pollack, plaintiffs obtained Registration on the Principal Register (No. 1,424,615) of its gun shape.[6] Bano'k, the gun's manufacturer, is alleged to have consented to such registration, although there was no written consent be-

---

6. The application for registration was initially rejected because the examiner believed the design to be primarily functional. Registration was thereafter allowed pursuant to 15 U.S.C. § 1052(f). This registration was predicated on the affidavit of Alan Clements, attesting to the fact that the mark had been used for five years and had become distinctive.

fore the Trademark Examiner. The registered mark is directed to the shape of the gun and is not limited to the color of the gun.

Plaintiffs assert that the trademark has presumptive validity, that the shape of the gun has acquired secondary meaning in the marketplace and that the allegedly infringed design aspects of the gun are neither essential nor functional. Plaintiffs point to the existence in the industry of other shapes of attaching guns (*e.g.*, scissor shapes and gun shapes with protuberances) to demonstrate this latter point. Plaintiffs also point to its vigorous and successful prosecution of other alleged infringers.

Defendant's guns are sold at significantly lower prices, and plaintiffs assert that they are of inferior quality with the consequence that plaintiffs are injured by the confusion said to result from the similarity in appearance.

▆▆ We reject defendant's claim that the trademark registration is invalid and should be cancelled because of the absence of written consent from the manufacturer. In that the Trademark Examiner was aware that the guns were manufactured by a third party, and the manufacturer has voiced no objection to the registration, the defendant cannot avail itself of this technicality.

▆▆ We find, however, that the guns imported by the defendant do not infringe any trademark or other rights of the plaintiffs.

We begin our analysis with plaintiffs' acknowledgment that it has no proprietary right to an attaching tag device that is shaped like a pistol or gun. Plaintiffs' registration is explicitly limited to "the entire configuration . . . reflected in the drawing." Further, we recognize that there are design aspects of plaintiffs' gun which are purely cosmetic. These include: (1) the depression at the top of the "nose," (2) the "beard" at the bottom of the "nose," (3) the straight line of demarcation between raised and depressed sections running substantially the entire length of the horizontal body, and (4) at the rear of the horizontal body, the raised section which sweeps upwardly and then forwardly along the rear and upper edges. But defendant's guns do not embody any of these purely decorative design elements. We find that defendant has sustained its burden of showing that the similarities between plaintiffs' gun and those of defendant arise from the functional features of a pistol.

The Court has on several occasions arrayed before it samples of those guns which plaintiffs concede to be non-infringing and those which plaintiffs assert violate its rights. The Court is unable to distinguish between the two groups once it is conceded that color [7] and pistol shape are not at issue.

Nor do we believe that plaintiffs have shown evidence of confusion in the industry. Plaintiffs cite instances in which guns manufactured by others have been returned to it for repair. It is not clear, however, that practice in the industry does not include some servicing by suppliers of guns sold by others. But none of the returned guns are among those challenged here. Some of the guns returned to plaintiffs for repair are Dennison guns, not defendant's, which plaintiffs do not claim are infringements.

Plaintiffs assert in connection with the defendant's antitrust counterclaim that Alan Clements has an extremely close personal relationship with Battista Lozio, whose company manufactures one of the guns imported by Meyers and complained of by Clements. Plaintiffs assert that they were fully prepared to sue Meyers or any other American importer of the Lozio gun but were not prepared to request Lozio not to export to America guns which plaintiffs claim violate their rights. We have serious reservations about the plaintiffs' good faith in asserting its claims with respect to the Lozio gun. See Part IV *infra*.

---

**7.** Judge Pollack's order had required defendant only to change the color of the gun but permitted defendant to sell guns otherwise identical to plaintiffs. The guns here challenged differ from plaintiffs' guns to a greater extent than required by the order.

As we discuss at pp. 24 *et seq., infra,* Meyers has indicated that it is in the process of developing a new gun to overcome certain disadvantages it perceives in the present shape of the gun. It may well be that this issue has little prospective significance. In any event, we find that there has been no past violation.

In reaching this conclusion we note, but do not place great weight on, the fact that plaintiffs have successfully litigated against other alleged infringers of its gun trademark. Some of those actions included patent as well as trademark claims. For some defendants, the cost of litigation may well have appeared to make it uneconomical to resist plaintiffs' broad sweeping claims.

### III. *Fan–Shaped Depiction of Tag Attachments; Claim of "First Designed"*

In 1979 and continuously thereafter, Clements used on its packaging a fan-shaped depiction of its TANGL–PRUFS attachment. Advertisements by plaintiffs in trade journals around the time of the product's launching also utilized the fan shape. That is, plaintiffs used an illustration of a clip of attachments with the base bent into an arc, causing the paddle ends to be displayed in the shape of an opened hand-held fan.

Defendant hired an advertising agency previously utilized by Clements to prepare its advertising and catalogue. Defendant's advertising also utilized a similar fan-shape depiction in advertising (but not packaging), and plaintiffs claim that this use constitutes unfair competition.

■■■ We find that plaintiffs have failed to prove that potential purchasers of tagging products associate a depiction of attachments in an advertisement with a fan-shape configuration with plaintiffs or that defendant's advertising was likely to deceive potential customers as to the source of the attachments.

The concept of bending a clip to depict more clearly the paddle end of the filament than would appear were the clip not arched

is not so unique or creative a concept as to entitle plaintiffs to the relief they seek.

■■■ We also reject plaintiffs' claim that the text of Meyers' advertisements which stated that its full round paddle attachments were the first designed to avoid tag switching gives rise to an actionable claim. In the entire spectrum of the claims between the parties, little attention was paid to this claim. We believe that the claim, although not literally true, is akin to legitimate sales puffing.

### *Defendant's Counterclaims*
### IV. *Tortious Interference*

■■■ We next address the relationship among Clements, Meyers and Lozio, the Italian manufacturer of attachment guns imported by Meyers.

Defendant, by way of counterclaim, asserts that plaintiffs are guilty of tortious interference with the contractual and business relations between Meyers and Lozio, its Italian supplier of attaching guns. Meyers contends that plaintiffs' conduct constitutes unfair competition under federal and state law. Moreover, Meyers contends that plaintiffs' conduct with respect to these matters constitutes "unclean hands" with the consequence that plaintiffs should be precluded from pursuing their claims.

As noted, Meyers purchased the attaching guns alleged by plaintiff to be infringing from Lozio. Alan Clements has a long standing close personal relationship with Battista Lozio, the principal of Lozio. As we have noted at p. 22, *supra,* despite this relationship, Clements never asked Lozio to stop shipping infringing guns to Meyers, choosing rather to sue the American importers of such guns.

Also as noted above, Meyers was in the process of developing a new gun which would, in its opinion, be more functional. Meyers was in the process of discussing with Lozio the proposed design and a large order for these guns.

On October 18, 1988, a telex obviously intended for Alan Clements was inadvertently sent to Meyers. Ex. GX, Appendix A

hereto. Based on this telefax and discovery conducted in Italy, defendant asserts that plaintiffs unfairly competed with it by tortiously interfering with Meyers' relationship with Lozio, defendant's gun supplier, so as to cut off Meyers' supply of attaching guns. Further, Meyers asserts that these events demonstrate Clements' lack of "clean hands" rendering plaintiffs' unfair competition claims unenforceable and warranting the award to defendant of fees for defending the trademark infringement claims because this constitutes an "exceptional case" within the meaning of 15 U.S.C. § 1117. In the telex, Battista Lozio states that he will no longer "serve anymore Meyers, as you wish—not even the 20,000 guns he had already ordered." The telex also states "As you requested us, ... a photocopie [sic] of the fax where Mr. Meyers proposes us to make 100,000 small guns."

On October 19, 1988, Alan Clements telefaxed Lozio stating "please remember it was not our idea or request that you stopped, it was Lozio's." Ex. 2. Affidavit of Patricia Favero Ex. GW.

Defendant contends that Clements induced Lozio not to deal with him and offered as an incentive for such conduct the furnishing by a European affiliate of Clements (Tach–I WK Ltd.) of a new type of electric tag gun desired by Lozio, who imports as well as manufactures guns.

Clements contends that Lozio's decision to cease doing business with Meyers was a unilateral decision on Lozio's part. Clements points to conflicts which developed in the relationship between Meyers and Lozio with respect to whether the agreed-upon price for a Meyers purchase from Lozio was to be in Italian lira or United States dollars. Meyers counters by showing that the currency controversy was resolved and that Meyers and Lozio continued their relationship thereafter. Battista Lozio's claim that he had no prior knowledge of the Clements–Meyers patent dispute is inconsistent with the documents which passed between Meyers and Lozio.

Counsel for the parties went to Italy and deposed Battista Lozio and members of his organization. Counsel for Clements represented Lozio as well as Clements at these depositions.

We believe that the evidence on the issue whether Lozio's refusal to deal further with Meyers was a unilateral decision or the result of connivance with Clements is sufficiently murky so that defendant has not sustained its burden of proof on this issue insofar as it relates to cessation of business relations.

■ We believe, however, that the evidence is clear that even after Lozio had determined at the September 1988 Bobbin Show in Atlanta not to sell guns to Meyers (Ex. GW, paragraph 5), Lozio continued to elicit information from Meyers concerning Meyers' new gun. Thus, on October 14, 1988, Patricia Favero, on behalf of Lozio, telexed Meyers: "About the new gun, please send us a detailed drawing." We know also from the misdirected telex (Ex. GX) that Lozio furnished Clements "As you requested us ... a photocopie [sic] of the fax where Mr. Meyers proposes us to make 100,000 small guns."

We conclude that Clements, through Lozio, was endeavoring to extract from Meyers as much information as possible concerning Meyers' plans for a new gun. Lozio, even accepting its version of the September 1988 decision not to sell Meyers, was eliciting from Meyers confidential information, not for legitimate commercial reasons, but rather to make that information available to Meyers' competitor, Clements.

Lozio concedes that the furnishing to one customer of private communications with another is contrary to established business practice of Lozio. We conclude that in its dealings with Lozio, Clements sought to obtain confidential trade secrets of Meyers, *i.e.*, the design of the new Meyers gun, by having Lozio deceptively appear to be soliciting the information for purposes of its manufacture of the gun for Meyers. This deceptive dealing fully supports Meyers' contention that Clements has "unclean hands."

## CONCLUSION

We have dealt herein with all of the issues raised by the parties except those relating to damages, costs and sanctions. We have noted in our Opinion of March 9, 1988 the issue arising by virtue of defendant's continued use of the 1980 catalogue showing the "clearly proscribed shapes" during the time Judge Pollack's order was in effect.[8] Plaintiffs also raise issues relating to defendant's alleged document destruction and the manner in which defendant has conducted this litigation. Defendant further contends that this is an extraordinary case in which it is entitled to the recovery of counsel fees.

The Court has serious doubts whether this Court, as a court of equity, should award either party any relief, *i.e.*, whether each side bears a sufficient degree of responsibility and fault so that the Court should leave the parties as it finds them.

We will defer all issues relating to damages, costs and sanctions pending further briefing and argument by the parties.

The Court will hold a conference on April 19, 1989 at 11:00 A.M. to deal with the calendaring of such other proceedings as are appropriate in the light of this Opinion.

SO ORDERED.

---

8. Plaintiffs also cite but do not press as a separate claim *defendant's continued use of a gun package insert which use was clearly contrary* to the provision in Judge Pollack's order that "the defendant agrees to cease using printed material derived from plaintiff or its licensor."

## APPENDIX A

1988-10-19 10:02 LOZIO & FIGLI COLOGNO M. 02 2533141 P.01

 **LOZIO** BATTISTA LOZIO & FIGLI S.P.A.

ACCESSORI E RELATIVE MACCHINE APPLICATIVE PER L'INDUSTRIA DELL'ABBIGLIAMENTO

Alan Clements

MILANO, LI ...... *fax ref.: 1199* ......
 18/10/88

DEFENDANT'S
EXHIBIT
G X

Dear Alan,

following your telephon call of yesterday –

1) I confirm you what decided in front of Patrizio that we will not serve anymore Meyers, as you wish – Not even the 20'000 guns he had already ordered –

2) Meyers asked us why we didn't go to visit him in New York when we were there –

3) As you requested us, I send you a photocopie of the fax where Mr. Meyers proposes us to make 100'000 small guns

4) Lisa has already asked to Jim but I want to know the price and the delivery of 10'000 electric guns.

5) Is it possible to make these guns with our name on a side and Banok on the other side? And what is the delivery in this case?

6) I want to know prices and deliver of all the guns I have ordered – Lisa has already spoken to Jim –
 We need urgently all these answers.

NB – When can you deliver us the first 1000 guns? All the customers who have seen them, have been enthousiast but I need the delivery date!

 CIAO, SALUTI A TUTTI DI CUORE Battista e Pier

TOTAL P.01